**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3064
_____

ACRA TURF CLUB, LLC, A New Jersey Limited
Liability Company;
FREEHOLD RACEWAY OFF TRACK, LLC, A New
Jersey Limited Liability Company,
                                                Appellants

v.

FRANCESCO ZANZUCCKI, Executive Director of the
New Jersey Racing Commission

_____

On Appeal from the United States District Court
for the District of New Jersey
District Court No. 3-12-cv-02775
District Judge: The Honorable Michael A. Shipp
_____

Argued February 12, 2014

Before: SMITH, SHWARTZ, and SCIRICA,

*Circuit Judges*

(Filed: March 31, 2014)

Kellen F. Murphy
John M. Pellecchia     [ARGUED]
Riker, Danzig, Scherer, Hyland & Perretti
One Speedwell Avenue
Headquarters Plaza
Morristown, NJ  07962
       *Counsel for Appellants*

Julie Barnes
Stuart M. Feinblatt    [ARGUED]
Office of Attorney General of New Jersey
Division of Law
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, NJ  08625
       *Counsel for Appellee*

_____

OPINION
_____


SMITH, *Circuit Judge.*

2

ACRA Turf Club, LLC ("ACRA") and Freehold Raceway Off Track, LLC ("Freehold") (collectively, "Plaintiffs") filed this suit pursuant to 42 U.S.C. §§ 1983 and 1988, against Francesco Zanzuccki ("Zanzuccki"), Executive Director of the New Jersey Racing Commission (the "Commission"), asserting that certain amendments to New Jersey's Off-Track and Account Wagering Act violate their rights under the United States Constitution. The District Court dismissed the case on *Younger* abstention grounds, and Plaintiffs appealed. During the pendency of this appeal, the Supreme Court issued its decision in *Sprint Communications, Inc. v. Jacobs*, 134 S. Ct. 584 (2013), which clarifies and reminds courts of the boundaries of the *Younger* abstention doctrine. Because this action does not fit within the framework for abstention outlined in *Sprint*, we will reverse.

## I.

In an effort to promote horse racing in the State, the New Jersey Legislature enacted the Off-Track and Account Wagering Act (the "Act"), N.J. Stat. Ann. § 5:5-127 *et seq.*, on February 1, 2002, providing for the establishment of up to fifteen off-track wagering ("OTW") facilities. The Act authorized the Commission to issue a license to a single entity, the New Jersey Sports and Exposition Authority (the "NJSEA"), but conditioned this grant upon the NJSEA entering into a participation agreement with all other entities that held

3

valid permits to conduct horse racing in the year 2000. N.J. Stat. Ann. §§ 5:5-130, 5:5-136. Other than the NJSEA, ACRA and Freehold were the only two entities to qualify as permit holders during the relevant period. Thus, on September 8, 2003, the NJSEA, ACRA, and Freehold entered into the Master Off-Track Wagering Participation Agreement (the "Agreement"), which allocated licensing rights for the fifteen OTW facilities as follows: NJSEA the right to license nine OTW facilities, Freehold the right to license four OTW facilities, and ACRA the right to license two OTW facilities. The Agreement also provided for geographic exclusivity near the participants' respective racetracks.

Although the Act authorized licenses for up to fifteen OTW facilities, by 2011, only four facilities had opened and were operating, including one by ACRA (Favorites at Vineland) and one by Freehold (Favorites at Toms River). The NJSEA owned two racetracks (Monmouth Park and the Meadowlands), but had leased control of those tracks to other entities, one of which was the New Jersey Thoroughbred Horsemen's Association,

Inc. (the "NJTHA"), which currently operates thoroughbred racing at both tracks.[1]

Disappointed by the slow pace at which OTW facilities were being opened, the New Jersey Legislature passed several amendments to the Act beginning in 2011, in an attempt to induce permit holders to open their remaining share of OTW facilities allocated by the Agreement. On February 23, 2011, the New Jersey Legislature enacted the Forfeiture Amendment, 2011 N.J. Laws 26, § 4 (amending N.J. Stat. Ann. § 5:5-130(b)(1)), which provided that permit holders would forfeit their rights to any OTW facility that was not licensed by January 1, 2012, unless the permit holder could demonstrate that it was "making progress" toward obtaining an off-track wagering license and establishing an OTW. The Forfeiture Amendment provided further that a permit holder's rights to an OTW facility, if forfeited, shall be made available to other "horsemen's organizations" without compensation to the permit

---

[1] The New Jersey Thoroughbred Horsemen's Association is defined in N.J. Stat. Ann. § 5:5-129 as "the association representing the majority of New Jersey thoroughbred owners and trainers responsible for receiving and distributing funds for programs designed to aid thoroughbred horsemen."

holder.[2] The NJTHA is one such organization that would be entitled to any forfeited rights.

On January 17, 2012, the New Jersey Legislature supplemented the Forfeiture Amendment by passing the Deposit Amendment, 2011 N.J. Laws 205, § 4 (amending N.J. Stat. Ann. § 5:5-130(b)(1)). The Deposit Amendment extended the forfeiture date to June 28, 2012, and added a requirement that each permit holder make a $1 million deposit for each OTW facility in its share that is not licensed by December 31, 2011. *Id.* The Deposit Amendment retained the "making progress" exception, thus allowing a permit holder to avoid the deposit requirement (and forfeiture of rights) if it could establish that it was "making progress toward obtaining an [OTW] license and establishing an [OTW] facility according to specified benchmarks developed by the commission." N.J. Stat. Ann. § 5:5-130(b)(1).

On the same date the Deposit Amendment was enacted, the New Jersey Legislature also passed the Pilot Program Act, 2011 N.J. Laws 228 (codified at N.J. Stat. Ann. § 5:5-186), which directed the Commission to

---

[2] A "horsemen's organization" is defined by the Simulcasting Racing Act, N.J. Stat. Ann. § 5:5-110 et seq., as an "organization or group representing a majority of horsemen engaged in competing for purses during a regularly scheduled horse race meeting, as the case may be." N.J. Stat. Ann. § 5:5-111.

establish a three-year Pilot Program for the installation of electronic wagering terminals in a limited number of bars and restaurants. N.J. Stat. Ann. § 5:5-186. Participation in the Pilot Program was limited to lessees or purchasers of NJSEA-owned racetracks, who were permitted to exchange any unused OTW licenses for a license to install electronic wagering terminals. The NJTHA secured the right to a Pilot Program license by paying $2 million to the other assignee of NJSEA's licenses, the New Meadowlands Racetrack, LLC.

On January 30, 2012, the Commission sent letters to ACRA, Freehold, and other OTW licensees, detailing the Forfeiture and Deposit Amendments and notifying each permit holder that it could extend its rights to establish licensed OTW facilities either by posting a deposit or demonstrating to the satisfaction of the Commission that the permit holder had made progress toward establishing its share of OTW facilities. On March 29, 2012, ACRA and Freehold submitted petitions to the Commission (the "Progress Petitions"), seeking to demonstrate that they were making progress toward opening their remaining OTW facilities. In their respective petitions, ACRA and Freehold also challenged the constitutionality of the amendments under the Contracts, Takings, Due Process, and Equal Protection Clauses of the United States Constitution.

On May 9, 2012, while their petitions were pending before the Commission, Plaintiffs filed the

instant suit in the United States District Court for the District of New Jersey, seeking to enjoin enforcement of the three amendments based on the same constitutional challenges set out in the Progress Petitions. Plaintiffs then filed a motion for preliminary injunction on May 24, 2012, claiming they faced irreparable harm if the state review process was allowed to proceed. Zanzuccki opposed the motion, arguing, *inter alia*, that abstention was warranted under *Younger v. Harris*, 401 U.S. 37 (1971).

While the preliminary injunction motion was pending before the District Court, the Commission held a meeting on June 20, 2012, to consider whether Plaintiffs had made progress toward establishing their share of OTW facilities. The Commission determined that both ACRA and Freehold had made progress toward establishing their unlicensed OTW facilities, absolved them of the obligation to submit deposits, and directed them to "comply with the requirements of the statute and continue to make progress on an annual basis." App. 320–21. Following the Commission's decision, Zanzuccki filed a letter with the District Court arguing that the Commission's decision eliminated any irreparable harm that would previously have resulted from denial of the motion for preliminary injunction. On July 11, 2012, the District Court denied Plaintiffs' motion for a preliminary injunction without prejudice, finding that there was no immediate, irreparable harm

"since deposit or forfeiture is at least a year away." App. 34.

As one of the entities that would have been entitled to licensing rights forfeited by ACRA or Freehold, the NJTHA was not satisfied with the Commission's decision that Plaintiffs had made sufficient progress in establishing their remaining unlicensed OTW facilities. Thus, on July 11, 2012, the NJTHA filed an appeal with the New Jersey Superior Court, Appellate Division (the "Making Progress Appeal"), contesting the Commission's determination. ACRA and Freehold

subsequently joined the Making Progress Appeal as co-respondents of the Commission.[3]

With the Making Progress Appeal pending before the New Jersey Appellate Division, Plaintiffs filed a motion for summary judgment in their federal action on October 12, 2012, seeking a judgment declaring that the Amendments were unconstitutional. Zanzuccki filed an

---

[3] On July 27, 2012, shortly after filing the Making Progress Appeal, the NJTHA—along with the Standardbred Breeders and Owners Association, who filed its own motion on August 7, 2012—filed a motion to intervene in Plaintiffs' federal suit and to dismiss based, in part, on *Younger* abstention. The Magistrate Judge struck as premature the part of the motion that sought to dismiss the Complaint, and the NJTHA filed an appeal of that order, which we dismissed for lack of jurisdiction. The District Court subsequently denied the motion to intervene on February 27, 2013, finding that the proposed intervenors failed to demonstrate that their interests were not adequately represented by Zanzuccki. The NJTHA filed a Notice of Appeal on March 5, 2013, which was docketed as No. 13-1634 (the "Intervention Appeal") and consolidated with this appeal for purposes of disposition only. We resolve the Intervention Appeal in a separate opinion issued concurrently with this decision.

opposition as well as a cross-motion for dismissal of the complaint based on *Younger* abstention. Specifically, Zanzuccki argued that the Making Progress Appeal provided an adequate opportunity for ACRA and Freehold to raise their constitutional challenges in state court.

On May 30, 2013, the District Court issued an Order and Memorandum Opinion granting Zanzuccki's cross-motion to dismiss the complaint on *Younger* abstention grounds. In reaching its conclusion, the District Court applied the three-part test articulated in *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 432 (1982), which requires (1) an ongoing state judicial proceeding; (2) which implicates important state interests; and (3) offers an adequate opportunity to raise the same constitutional challenges presented in the federal action. Finding these requirements satisfied, the District Court applied *Younger* abstention and dismissed the complaint.

Plaintiffs timely appealed.

## II.

The District Court had federal question jurisdiction under 28 U.S.C. § 1331. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, because it arises following a final order of dismissal.

11

"We exercise plenary review over whether the requirements for abstention have been met." *Miller v. Mitchell*, 598 F.3d 139, 145–46 (3d Cir. 2010).

## III.

While this appeal was pending, the Supreme Court decided *Sprint Communications, Inc. v. Jacobs*, 134 S. Ct. 584 (2013), reiterating that *Younger* abstention is appropriate in only three narrow categories of cases. Although *Sprint* provides a much needed framework for evaluating abstention issues, the Court explained that *Sprint* was merely a restatement of the abstention principles found in the Court's existing precedent. Accordingly, our analysis must consider the full body of abstention case law, beginning with *Younger* itself.

In *Younger v. Harris*, 401 U.S. 37, 53–54 (1971), the Supreme Court held that federal courts should decline to enjoin a pending state court criminal prosecution absent a showing that the charges had been brought in bad faith or with an intent to harass. The plaintiff in *Younger* was indicted in state court for distributing leaflets in violation of the California Criminal Syndicalism Act, and he sought a federal court injunction against the state criminal prosecution on the grounds that the Act and the charges brought under it violated the First and Fourteenth Amendment. A three-judge district court agreed with the plaintiff, but the Supreme Court reversed, holding that federal courts should not interfere with state

criminal proceedings, "particularly . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Younger*, 401 U.S. at 43–44. The Court explained that this decision was founded on "the notion of 'comity,' that is a proper respect for state functions." *Id.* at 44. The result was a rule that state criminal proceedings should be enjoined only in "extraordinary circumstances, where the danger of irreparable loss is both great and immediate" and it "plainly appears that [asserting the constitutional defense in state court] would not afford adequate protection." *Id.* at 45 (citations omitted).

Although *Younger* was initially developed as a limitation on the ability of federal courts to interfere with pending state *criminal* proceedings, the Supreme Court has since extended *Younger*'s application to bar federal interference with certain state civil and administrative proceedings. *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975), was the groundbreaking decision which extended *Younger* into the civil arena. In *Huffman*, state officials instituted a civil nuisance proceeding and successfully obtained a judgment against an adult movie theater for violating an Ohio statute declaring the exhibition of obscene films to be a nuisance. Instead of appealing the decision within the state court system, the theater company filed a federal action under 42 U.S.C. § 1983. The Supreme Court held that abstention was the proper course, emphasizing that the state's nuisance proceeding

13

was "more akin to a criminal prosecution than are most civil cases." *Huffman*, 420 U.S. at 604. The Court noted that the state was a party to the civil nuisance proceeding, which was "both in aid of and closely related to criminal statutes which prohibit the dissemination of obscene materials." *Id.* Thus, the Court concluded that the "State's interest in the nuisance litigation is likely to be every bit as great as it would be were this a criminal proceeding."[4] *Id.*

The Court revisited the *Younger* abstention doctrine two years later with its decision in *Trainor v. Hernandez*, 431 U.S. 434 (1977). In *Trainor*, the Illinois Department of Public Aid instituted a civil fraud proceeding in state court to recover welfare benefits obtained by Hernandez and his wife, who had allegedly concealed their personal assets when applying for public

---

[4] Three justices dissented, arguing that, because civil proceedings can be initiated simply by filing a complaint, it is too easy for the state to "strip [someone] of a forum and a remedy that federal statutes were enacted to assure." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 615 (1975) (Brennan, J., dissenting). Although recognizing that *Huffman* was limited to quasi-criminal proceedings, Justice Brennan expressed his concern that the majority's decision was "obviously only the first step" toward applying *Younger* abstention to all civil cases in state court. *Id.* at 613.

assistance. After the department obtained a writ of attachment pursuant to the Illinois Attachment Act against the defendant's savings account, Hernandez brought a federal action challenging the constitutionality of the attachment statute and seeking declaratory and injunctive relief. The Supreme Court again held that abstention was appropriate even though the proceeding was wholly civil. The Court emphasized that "the State was a party to the suit in its role of administering its public-assistance programs" and, by pursuing the action, was "vindicat[ing] important state policies such as safeguarding the fiscal integrity of those programs." *Id.* at 444. As in *Huffman*, the Court pointed out that the state could have vindicated the same interests by initiating a criminal enforcement action. *Id.* The Court concluded that "the principles of *Younger* and *Huffman* are broad enough to apply to interference by a federal court with an ongoing civil enforcement action such as this, *brought by the State in its sovereign capacity*." *Id.* (emphasis added).

It was not long before the Court considered *Younger*'s application again in *Moore v. Sims*, 442 U.S. 415 (1979). In *Moore*, the Texas Department of Human Resources (the "DHR") acted pursuant to an emergency *ex parte* order to remove children from their home based on suspicions of child abuse. The parents filed suit in federal court challenging the constitutionality of the Texas law authorizing the DHR's actions, and a three-

15

judge district court held that the law was unconstitutional. The Supreme Court reversed, concluding that the district court should have abstained and dismissed the case. The Court explained that its prior cases demonstrated that the policy concerns articulated in *Younger* are "fully applicable to civil proceedings in which important state interests are involved." *Id.* at 423. Once again, the Court acknowledged that, like the nuisance proceeding in *Huffman*, the temporary removal of a child based on suspicions of child abuse is "in aid of and closely related to criminal statutes." *Id.* (quoting *Huffman*, 420 U.S. at 604). The Court then considered "whether [the parents'] constitutional claims could have been raised in the pending state proceedings," explaining that "abstention is appropriate unless state law clearly bars the interposition of the constitutional claims." *Id.* at 425–26. Because Texas law did not present any procedural barriers to the presentation of the parents' constitutional claims, the Court concluded that abstention was warranted. *Id.* at 432.

By the time *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982), was decided, the Supreme Court had already applied *Younger* abstention when confronted with a variety of ongoing state court civil proceedings. *Middlesex*, however, marked the first time the Court invoked the abstention doctrine in favor of a state *administrative* proceeding. The plaintiff in *Middlesex*, a lawyer, filed a suit in federal

16

court seeking to enjoin as unconstitutional ongoing investigations and administrative proceedings by the New Jersey state bar ethics committee. Agreeing with the district court's decision to abstain, the Supreme Court explained that "[t]he policies underlying *Younger* are fully applicable to noncriminal judicial proceedings when important state interests are involved," *id.* at 432, which may be "demonstrated by the fact that the noncriminal proceedings bear a close relationship to proceedings criminal in nature." *Id.* (citing *Huffman*, 420 U.S. at 604). Where such "vital state interests" are found, the Court proclaimed, "a federal court should abstain 'unless state law clearly bars the interposition of the constitutional claims.'" *Id.* (quoting *Moore*, 442 U.S. at 426). The Court then set out a three-part inquiry to guide its analysis:

> *first*, do state bar disciplinary hearings . . . constitute an ongoing state judicial proceeding; *second*, do the proceedings implicate important state interests; and *third*, is there an adequate opportunity in the state proceedings to raise constitutional challenges.

*Id.* at 432 (emphasis in original). Finding this three-part test satisfied,[5] the Court abstained.[6] *Id.* at 437.

A few years later, in *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*, 477 U.S. 619 (1986), the Supreme Court, for the second time, found *Younger* abstention was appropriate in view of an ongoing state administrative proceeding. In *Dayton*, a pregnant teacher at a church-run school filed a complaint with the Ohio Civil Rights Commission after the school had refused to renew her contract because of its official view that mothers should stay home with their preschool

---

[5] As to the third prong, the Court acknowledged that the state ethics committee had concluded its evaluation without considering the plaintiff's constitutional arguments. Nonetheless, the Court found that the plaintiff had an adequate opportunity to present those challenges to the New Jersey Supreme Court, which had appellate jurisdiction over the ethics committee's decision. *Middlesex*, 457 U.S. at 435–36.

[6] Justice Brennan concurred in the decision and noted that despite his general view that *Younger* is inapplicable to civil proceedings, he was inclined to join the judgment of the majority in light of the "quasi-criminal nature of bar disciplinary proceedings." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 438 (1982) (Brennan, J., concurring).

children. The Commission concluded that there was probable cause to conclude that the school's conduct amounted to impermissible sex discrimination and, accordingly, initiated administrative proceedings against the school. The school defended the administrative proceeding by asserting a defense under the First Amendment and also filed suit in federal court to enjoin the administrative action. The Supreme Court, once again, held that abstention was proper. Although it did not directly apply the three-part *Middlesex* test, the Court proceeded along similar lines by first emphasizing that the administrative proceeding was "judicial in nature" from its outset. *Dayton*, 477 U.S. at 627. The Court reiterated that *Younger* principles apply when there are state proceedings "in which important state interests are vindicated, so long as in the course of those proceedings the federal plaintiff would have a full and fair opportunity to litigate his constitutional claim." *Id.* The Court concluded that the state's interest in eliminating gender discrimination was important, and that the availability of state judicial review ensured an adequate opportunity to raise constitutional issues. *Id.* at 628–29.

The most recent pre-*Sprint* abstention case is *New Orleans Public Service, Inc. v. Council of the City of New Orleans (NOPSI)*, 491 U.S. 350 (1989). There, for the first time in nearly two decades, the Supreme Court scaled back *Younger*'s expanding reach and declined to abstain in favor of a state proceeding. In *NOPSI*, a utility

19

company sought a rate increase from the New Orleans City Council to recover costs imposed by the Federal Energy Regulatory Commission. The Council denied the rate increase and then filed a declaratory judgment action in state court to confirm the validity of its order. The utility company contested the state action and also initiated a suit in federal court challenging the constitutionality of the Council's decision. The district court abstained, based in part on *Younger*, and the court of appeals affirmed. The Supreme Court reversed and declared that federal court abstention is not warranted in all instances where there are pending state court proceedings. The Court stated:

> Although our concern for comity and federalism has led us to expand the protection of *Younger* beyond state criminal prosecutions, to civil enforcement proceedings, and even to civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions, it has never been suggested that *Younger* requires abstention in deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances

> justify a federal court's refusal to decide a
> case in deference to the States.

*NOPSI*, 491 U.S. at 367–68 (citations omitted). The Court ultimately concluded that the Council's rate setting was essentially a legislative task and that *Younger* had never been applied to prevent review of such matters. The Court acknowledged that its decision would likely preclude the state court from deciding the issue, but held that this possibility did not compel abstention, noting that "there is no doctrine that the availability or even the pendency of state judicial proceedings excludes the federal courts." *Id.* at 373.

## IV.

More than two decades passed between *NOPSI* and *Sprint Communications v. Jacobs*, 134 S. Ct. 584 (2013). During that period, district courts demonstrated greater and greater willingness to abstain from adjudicating federal claims in deference to ongoing state proceedings. *See* Joshua G. Urquhart, *Younger Abstention and Its Aftermath: An Empirical Perspective*, 12 Nev. L.J. 1, 9 n.62 (2011) (discussing empirical finding that, between 1995 and 2006, a party seeking abstention under *Younger* was successful 51.6 percent of the time). When analyzing abstention questions during this twenty-four year period, most courts strictly and mechanically applied the three-part test from *Middlesex*, while largely ignoring the limitations imposed by *NOPSI*.

21

*Id.* at 8–9. That approach commonly resulted in abstention because "the three *Middlesex* factors have been expanded so broadly that most parallel state criminal, civil, or administrative enforcement or similar actions will satisfy them." *Id*. at 9. Perhaps recognizing this tendency of federal courts to decline to adjudicate federal claims, the Court in *Sprint* rejected the notion that *Younger* abstention is the rule rather than the exception.[7] The Court declared that *Younger* is an "exceptional" remedy to be invoked in only a narrow range of cases. *Sprint*, 134 S. Ct. at 588.

    *Sprint* involved a dispute between two telecommunication service providers, Sprint (a national provider) and Windstream (an Iowa communications company). Sprint had long paid intercarrier access fees to Windstream for long distance calls placed by Sprint customers to Windstream's in-state customers. In 2009, however, Sprint began withholding payment for a subset

---

[7] A review of Third Circuit precedent reveals that our Court was not excepted from the pitfall of mechanically applying the *Middlesex* factors as a stand-alone test. However, because our decision today requires a straightforward application of *Sprint*, and because neither party has asked us to reconsider prior Third Circuit decisional law, we do not address the extent to which our holding disrupts our Court's pre-*Sprint* precedential authority.

of those calls, classified as Voice over Internet Protocol ("VoIP"), based on its interpretation of the Telecommunications Act of 1996. The dispute eventually ended up in an administrative proceeding before the Iowa Utilities Board (the "IUB"), which rejected Sprint's interpretation of the federal statute and held that intrastate fees applied to VoIP calls.

Seeking to overturn the IUB ruling, Sprint commenced two lawsuits. First, it filed suit in federal court seeking a declaration that the Telecommunications Act preempted the IUB's decision. Sprint also appealed the IUB's decision to the Iowa state courts, which Sprint explained was simply a protective measure because of Eighth Circuit precedent requiring exhaustion of state remedies before litigating in federal court. On motion by the IUB, the district court dismissed Sprint's federal suit on *Younger* abstention grounds. The Eighth Circuit affirmed, based in large part on the three-part *Middlesex* test.

In reversing, the Supreme Court emphasized that as a "general rule . . . 'the pendency of an action in [a] state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.'" *Sprint*, 134 S. Ct. at 588 (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)) (alteration omitted). The Court reiterated that "[p]arallel state-court proceedings do not detract from" a federal court's "virtually unflagging" obligation to hear

23

and decide a case. *Id.* at 591 (quoting *Colo. River Water Conservation Dist.*, 424 U.S. at 817).

The Court then reiterated the limitations on the abstention doctrine set out in *NOPSI*, explaining that *Younger* can overcome the general principle that federal courts must hear and decide cases only in "exceptional" circumstances, where "the prospect of undue interference with state proceedings counsels against federal relief." *Sprint*, 134 S. Ct. at 588 (quoting *NOPSI*, 491 U.S. at 368). These "exceptional" circumstances arise only where the federal action interferes with one of three categories of cases: (1) "ongoing state criminal prosecutions" (as in *Younger* itself); (2) "certain civil enforcement proceedings" (such as the nuisance action in *Huffman*); and (3) "civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions" (such as state court civil contempt proceedings).[8] *Id.* at 591 (internal

---

[8] Two Supreme Court cases implicate this third category subject to *Younger* abstention. *See Juidice v. Vail*, 430 U.S. 327, 336 & n.12 (1977) (civil contempt order); *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 13 (1987) (requirement for the posting of bond pending appeal). Because this is a unique breed of *Younger* abstention which is not relevant to this appeal, we do not provide a detailed discussion of these cases here.

quotation marks and citations omitted). These categories, said the Court, "define *Younger*'s scope." *Id.*

After noting that the first and third categories plainly did not accommodate the IUB proceeding, the Court turned to consider whether the proceeding was a "civil enforcement proceeding" of the type to which *Younger* applied. *Id.* at 592. The Court explained that cases applying *Younger* in the context of civil enforcement proceedings generally involve state proceedings that are "akin to a criminal prosecution in important respects." *Id.* (internal quotation marks omitted). Such actions, the Court noted, "are characteristically initiated to sanction the federal plaintiff, *i.e.*, the party challenging the state action, for some wrongful act." *Id.* (citing *Middlesex*, 457 U.S. at 433–34). Additionally, "a state actor is routinely a party to the state proceeding and often initiates the action." *Id.* (citing *Dayton*, 477 U.S. at 619; *Moore*, 442 U.S. at 419–20; *Trainor*, 431 U.S. at 444; *Huffman*, 420 U.S. at 598). Finally, the Court stated that "[i]nvestigations are commonly involved, often culminating in the filing of a formal complaint or charges." *Id.* (citing *Dayton*, 477 U.S. at 624; *Middlesex*, 457 U.S. at 433). Applying this framework, the Court concluded that the IUB proceeding was not the type of civil enforcement proceeding to which *Younger* applies. The Court explained:

> It is not "akin to a criminal prosecution."
> Nor was it initiated by "the State in its

25

sovereign capacity." A private corporation, Sprint, initiated the action. No state authority conducted an investigation into Sprint's activities, and no state actor lodged a formal complaint against Sprint.

*Sprint*, 134 S. Ct. at 592 (citations omitted).

The Court then addressed the Eighth Circuit's heavy reliance on the three-part *Middlesex* test. Recalling the facts from *Middlesex* (a lawyer's attempt to enjoin an investigation and administrative proceedings by a state bar ethics committee), the Court stated that *Middlesex* fit neatly within the second category of *Younger* cases because it was "indeed 'akin to a criminal proceeding.'" *Sprint*, 134 S. Ct. at 593. Acknowledging that lower courts were inappropriately treating the three *Middlesex* factors as a stand-alone test, the Court clarified that "[t]he three *Middlesex* conditions . . . *were not dispositive*," but "were, instead, *additional* factors appropriately considered by the federal court before invoking *Younger*." *Id.* (first emphasis added). The Court explained:

Divorced from their quasi-criminal context, the three *Middlesex* conditions would extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest. That result is irreconcilable with

26

our dominant instruction that, even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the "exception, not the rule."

*Id.* (citation omitted).

## V.

Although pre-*Sprint* case law provides significant guidance in deciding this case, *Sprint* itself supplies the framework for our analysis. *Sprint* offers a forceful reminder of the longstanding principle that federal courts have a "virtually unflagging" obligation to hear and decide cases within their jurisdiction. *Sprint*, 134 S. Ct. at 591 (quoting *Colo. River*, 424 U.S. at 817); *see also Cohens v. Virginia*, 19 U.S. 264, 404 (1821) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given."). Abstention under the *Younger* line of cases overcomes this principle only when federal litigation threatens to interfere with one of three classes of cases: (1) state criminal prosecutions, (2) state civil enforcement proceedings, and (3) state civil proceedings involving orders in furtherance of the state courts' judicial function. *Sprint*, 134 S. Ct. at 591. As in *Sprint*, this case does not fit within the first or third categories. We, therefore, must consider whether the state proceeding, including the Making Progress Appeal currently pending before the

Appellate Division of the New Jersey Superior Court,[9] is the type of "exceptional" civil enforcement proceeding from which *Younger* would compel abstention. *Sprint*, 134 S. Ct. at 588. We conclude it is not.

After *Sprint*, the threshold requirement for applying *Younger* abstention is that the state civil enforcement proceeding must be "quasi-criminal" in nature. *Sprint*, 134 S. Ct. at 593; see also *id.* at 592 (stating that *Younger* generally applies only when the state proceeding is "'akin to a criminal prosecution' in 'important respects'"). In evaluating whether a state proceeding is quasi-criminal, we consider the factors set out in *Sprint*, including whether (1) the action was

---

[9] Although the Commission's review of the Progress Petitions and the Making Progress Appeal could be viewed as two different proceedings, the Supreme Court has repeatedly assumed, without deciding, that an administrative proceeding and the state court's review are part of a single "unitary process." *Sprint*, 134 S. Ct. at 592 ("We will assume without deciding, as the Court did in *NOPSI*, that an administrative adjudication and the subsequent state court's review of it count as a 'unitary process' for *Younger* purposes."). We follow this approach and assume, for purposes of this opinion, that the Commission's review of the Progress Petitions and the Making Progress Appeal are both components of a single state proceeding.

28

commenced by the State in its sovereign capacity, (2) the proceeding was initiated to sanction the federal plaintiff for some wrongful act, and (3) there are other similarities to criminal actions, such as a preliminary investigation that culminated with the filing of formal charges. *Id.* at 592. We also consider whether the State could have alternatively sought to enforce a parallel criminal statute. *See, e.g.*, *Huffman*, 420 U.S. at 604 (describing the civil nuisance action as "closely related to criminal statutes which prohibit the dissemination of obscene materials"); *Trainor*, 431 U.S. at 444 (pointing out that "[t]he state authorities also had the option of vindicating these policies through criminal prosecutions").

The state proceeding at issue in this appeal does not bear any of the hallmarks that *Sprint* and its predecessors identify with quasi-criminal actions. It was not initiated by the State in its sovereign capacity, a point which is illuminated by the fact that no state actor conducted an investigation or filed any type of formal complaint or charges. Instead, the state proceeding was initiated by Plaintiffs (private entities) when they voluntarily submitted their Progress Petitions to the Commission for review. There is also no evidence that the state proceeding was commenced to sanction Plaintiffs for some wrongful act. Rather, the requirements imposed by the Forfeiture and Deposit Amendments were plainly intended to incentivize conduct which the State believed would be economically beneficial. Finally,

there is no indication that the policies implicated in the state proceeding could have been vindicated through enforcement of a parallel criminal statute. Because nothing here suggests the state proceeding is any "more akin to a criminal prosecution than are most civil cases," *Huffman*, 420 U.S. at 604, we conclude that the District Court's decision to abstain was incorrect.

Zanzuccki challenges the contention that the state proceeding is not quasi-criminal. In particular, he asserts that the State initiated the proceeding in its sovereign capacity.[10] He argues that the Commission, a state actor, commenced the proceeding "on January 30, 2012, when [it] sent a letter to [Plaintiffs] advising that they could extend their rights to unlicensed OTW facilities either by posting a deposit or by demonstrating in a petition, to the satisfaction of the Racing Commission, that they had

---

[10] After the Supreme Court issued its opinion in *Sprint*, the Court sent a notice to the parties requesting supplemental briefing on *Sprint*'s application to this appeal. In response to the Court's inquiry, Zanzuccki initially conceded that he "cannot . . . describe the [state] civil enforcement proceeding as 'akin to a criminal prosecution.'" Zanzuccki's Dec. 26, 2013 Ltr. Br. at 3. At oral argument, however, Zanzuccki retreated from that position and argued that the state proceeding sufficiently resembled the type of enforcement actions *Sprint* suggests are subject to *Younger* abstention.

made progress toward establishing their share of the remaining OTWs." Zanzuccki's Dec. 26, 2013 Ltr. Br. at 3. We disagree.[11]

We fail to see how the Commission's January 30, 2012 letter represents an effort by the State to initiate any type of civil proceeding against Plaintiffs. The letter was a purely informational document intended to inform Plaintiffs of the requirements imposed by the newly-enacted Amendments. Indeed, it did not provide any

---

[11] Judge Shwartz would find that this letter was more than informational and would be sufficient to constitute the initiation of a proceeding by a state actor, particularly because it provided the avenue for the licensees to seek relief from the Forfeiture and Deposit Amendments and it made clear that a lack of response would result in a revocation of the licensing rights or the requirement to pay a $1 million deposit for each unopened facility. As a result, Judge Shwartz has a different view of the January 30, 2012 letter and would not rule out the use of a letter as a means to initiate a proceeding to which *Younger* applies. Although we hold the Commission's January 30, 2012 letter does not represent an attempt by the State to initiate civil enforcement proceedings against Plaintiffs, we express no opinion as to whether some method other than the Commission's letter could constitute a state's initiation of such proceedings as described by the Supreme Court in *Sprint*.

31

information other than to describe the contents of the statute, a fact that is demonstrated by the letter's concluding paragraph, which states:

> Please be advised that the Commission is requesting that any permit holder which intends to seek an extension pursuant to the circumstances in [the Deposit Amendment] shall file a petition with the [C]ommission no later than March 31, 2012 . . . . Compliance with this filing deadline will allow the [C]ommission time to evaluate the petition and make a determination prior to [the deposit deadline]. Should you have any questions, please feel free to contact me.

App. 165. Both the tone and the obvious purpose of the letter are clear from this excerpt. Nothing about the letter reflects an effort by the Commission to initiate adverse, quasi-criminal proceedings. Significantly, the Commission's letter did not demand any action by ACRA or Freehold, but rather simply "advise[s]" them about changes in the law. *Id.*

Moreover, the Commission's letter in no way resembles the initiation procedures employed by state actors in cases where the Supreme Court has applied *Younger* abstention. Indeed, all of those cases involved a state entity that commenced civil or administrative proceedings by filing some type of formal complaint or

32

charges. *See, e.g.*, *Huffman*, 420 U.S. at 598 ("[The state actor] instituted a nuisance proceeding in the Court of Common Pleas . . . ."); *Trainor*, 431 U.S. at 435 ("The Illinois Department of Public Aid . . . filed a lawsuit in the Circuit Court of Cook County . . . ."); *Moore*, 442 U.S. at 419 ("[T]he Department . . . institute[d] a suit for emergency protection of the children under . . . the Texas Family Code."); *Middlesex*, 457 U.S. at 428 ("The Committee then served a formal statement of charges on [the federal plaintiff]."); *Dayton*, 477 U.S. at 624 ("[T]he Commission initiated administrative proceedings against [the school] by filing a complaint."). To be sure, the Supreme Court has not directly held that *Younger* applies only when a state actor files a complaint or formal charges. Nonetheless, its *Younger* progeny suggest that a state's "initiation" procedure must proceed with greater formality than merely sending a targeted advisory notice to a class of people that may be affected by new legislation.

We likewise reject Zanzuccki's contention that the state proceeding threatened the imposition of sanctions if Plaintiffs failed to "make progress" toward establishing their remaining OTW facilities. Zanzuccki argues that we should analogize the Commission's authority to revoke Plaintiffs' licensing rights and/or require Plaintiffs to post a $1 million deposit for each unopened facility to the type of sanctions found in a quasi-criminal proceeding. We do not agree.

There is no dispute that ACRA and Freehold would have faced undesirable consequences—in the way of potential forfeiture of rights or a substantial deposit requirement—if they had failed to show they were "making progress" toward licensing their remaining OTW facilities. But negative consequences are not the same thing as sanctions. Sanctions are retributive in nature and are typically imposed to punish the sanctioned party "for some wrongful act." *Sprint*, 134 S. Ct. at 592. No party here suggests that Plaintiffs' conduct (or inaction) in failing to establish its OTW facilities was unlawful, much less "wrongful." In fact, Zanzuccki admits that punishment was not the goal, explaining that "the amendments to the Off-Track and Account Wagering Act . . . were designed to *incentivize* the Appellants to open their remaining OTWs." Zanzuccki's Dec. 26, 2013 Ltr. Br. at 3 (emphasis added). Significantly, even if Plaintiffs had not prevailed on their Progress Petitions, they still would not have been legally obligated to make the $1 million deposit. At that point, making the deposit would simply have been a cost of doing business, with the choice of whether to make such payment resting entirely with Plaintiffs.

Our review of Supreme Court cases applying *Younger* highlights why the deposit requirement and potential forfeiture of rights at issue here are not comparable to "sanctions" found in quasi-criminal proceedings. For example, in *Huffman*, the state filed a

complaint against a theater company for violating the obscenity provisions of a nuisance statute, and it sought to sanction the theater by forcing its closure and seizing and selling its personal property. *Huffman*, 420 U.S. at 598. *Huffman* undoubtedly involved a state civil enforcement action that was initiated to sanction the federal plaintiff for what the state considered wrongful conduct. The state proceeding in *Trainor*—a civil action to recover welfare benefits fraudulently obtained by the defendant—likewise involved an attempt by the state to sanction an individual for his wrongful conduct. 431 U.S. at 435–36. So, too, did *Middlesex*, where a lawyer was investigated for and charged with acting in a manner "prejudicial to the administration of justice." 457 U.S. at 428. If the charges against him were confirmed, he would have been subject to disbarment. *Id.* at 427. And finally, in *Dayton*, an administrative proceeding was initiated following an investigation that revealed a private school had engaged in unlawful employment discrimination. 477 U.S. at 624. If the charges were substantiated, the school would have been required to reinstate the plaintiff with back pay and would have become subject to "continuing surveillance" by the state. *Dayton*, 477 U.S. at 632 (Stevens, J., concurring).

Dating back to *Huffman*, each of these cases clearly involved civil enforcement proceedings that were "initiated to sanction the federal plaintiff . . . for some wrongful act." *Sprint*, 134 S. Ct. at 592. In contrast, as

35

we have pointed out here, the New Jersey legislature and the Commission were merely attempting to induce ACRA and Freehold to exercise licensing rights for which Plaintiffs had lawful ownership. Like tax increases and new regulatory obligations, the deposit requirement and potential forfeiture of rights may have been unwelcome changes in the law for ACRA and Freehold. They are not, however, the equivalent of sanctions found in criminal or quasi-criminal proceedings.

After examining the state proceeding at issue in this appeal, we can identify none of the quasi-criminal characteristics discussed in *Sprint* and found in the Court's past *Younger* abstention cases. Even accepting, for purposes of this appeal, that the state proceeding is a

"civil enforcement" action,[12] we conclude it is not the type of proceeding entitled to *Younger* deference because it is no "more akin to a criminal prosecution than are most civil cases." *Huffman*, 420 U.S. at 604. Accordingly, we will reverse the order of the District Court and remand for further proceedings.

---

[12] Although we hold that the state proceeding is not entitled to *Younger* deference because it is not "akin to a criminal prosecution," we are skeptical that the state proceeding even fits within the "civil enforcement" category to begin with. In *NOPSI*, the Court emphasized that "it has never been suggested that *Younger* requires abstention in deference to a state judicial proceeding reviewing legislative or *executive action*." *NOPSI*, 491 U.S. at 368 (emphasis added). The Commission's review of the Progress Petitions was arguably nothing more than an executive action, and the Making Progress Appeal could be viewed as a judicial review of such executive action. If this is true, the District Court's decision to abstain was plainly inappropriate under *NOPSI*. Yet, the record does not permit us to determine whether the Commission's review should be characterized as executive action or as an "administrative proceeding[] [that was] 'judicial in nature' from the outset." *Dayton*, 477 U.S. at 627 (discussing *Middlesex*). Accordingly, we do not address this issue further.

37