**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3775
_____

ACRA TURF CLUB, LLC, A New Jersey Limited Liability Company;
FREEHOLD RACEWAY OFF TRACK, A New Jersey Limited Liability Company

v.

FRANCESCO ZANZUCCKI, Executive Director
of the New Jersey Racing Commission

Acra Turf Club, LLC; Freehold Raceway Off Track, LLC,
Appellants
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. No. 3-12-cv-02775)
District Judge: Hon. Michael A. Shipp
_____

Argued January 23, 2018
_____

Before: HARDIMAN, VANASKIE, and SHWARTZ, Circuit Judges.

(Filed: February 1, 2018)


Cristin M. Boyle, Esq.
James C. Meyer, Esq.  [ARGUED]
Riker Danzig Scherer Hyland & Perretti
One Speedwell Avenue
Headquarters Plaza
Morristown, NJ 07962

    *Counsel for Appellants*

George N. Cohen, Esq.
Stuart M. Feinblatt, Esq.  [ARGUED]
Office of the Attorney General of New Jersey
25 W. Market Street
P.O. Box 112
Richard J. Hughes Justice Complex
Trenton, NJ 08625

      *Counsel for Appellee*

_____

OPINION[*]
_____

SHWARTZ, <u>Circuit Judge</u>.

Plaintiffs ACRA Turf Club, LLC ("ACRA") and Freehold Off Track Raceway, LLC ("Freehold") (collectively, "Plaintiffs") brought this action under 42 U.S.C. § 1983 against Defendant Francesco Zanzuccki, the Executive Director of the New Jersey Racing Commission (the "NJRC"), asserting that certain amendments to New Jersey's Off-Track and Account Wagering Act ("OTAWA" or the "Act") violate the Contract, Takings, Due Process, and Equal Protection Clauses.  Plaintiffs appeal the District Court's orders holding that the amendments do not violate these constitutional provisions. We agree with the District Court and will affirm.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

I

Our opinion in <u>ACRA Turf Club, LLC v. Zanzuccki</u>, 748 F.3d 127 (3d Cir. 2014),

sets forth almost all of the relevant facts, which the parties do not contest, and which we

now repeat.

> In an effort to promote horse racing in the State, the New Jersey Legislature enacted [the Act], N.J. Stat. Ann. § 5:5-127 <u>et seq.</u>, on February 1, 2002, providing for the establishment of up to fifteen off-track wagering ("OTW") facilities. The Act authorized the [NJRC] to issue a license to a single entity, the New Jersey Sports and Exposition Authority (the "NJSEA"), but conditioned this grant upon the NJSEA entering into a participation agreement with all other entities that held valid permits to conduct horse racing in the year 2000. N.J. Stat. Ann. §§ 5:5-130, 5:5-136. Other than the NJSEA, ACRA and Freehold were the only two entities to qualify as permit holders during the relevant period. Thus, on September 8, 2003, the NJSEA, ACRA, and Freehold entered into the Master Off–Track Wagering Participation Agreement (the "Agreement"), which allocated licensing rights for the fifteen OTW facilities as follows: NJSEA the right to license nine OTW facilities, Freehold the right to license four OTW facilities, and ACRA the right to license two OTW facilities. The Agreement also provided for geographic exclusivity near the participants' respective racetracks.

> Although the Act authorized licenses for up to fifteen OTW facilities, by 2011, only four facilities had opened and were operating, including one by ACRA (Favorites at Vineland) and one by Freehold (Favorites at Toms River). The NJSEA owned two racetracks (Monmouth Park and the Meadowlands), but had leased control of those tracks to other entities, one of which was the New Jersey Thoroughbred Horsemen's Association, Inc. (the "NJTHA"), which currently operates thoroughbred racing at both tracks.[1]

> Disappointed by the slow pace at which OTW facilities were being opened, the New Jersey Legislature passed several amendments to the Act beginning in 2011, in an attempt to induce permit holders to open their remaining share of OTW facilities allocated by the Agreement. On February

---

[1] The New Jersey Thoroughbred Horsemen's Association is defined in N.J. Stat. Ann. § 5:5-129 as "the association representing the majority of New Jersey thoroughbred owners and trainers responsible for receiving and distributing funds for programs designed to aid thoroughbred horsemen."

23, 2011, the New Jersey Legislature enacted the Forfeiture Amendment, 2011 N.J. Laws 26, § 4 (amending N.J. Stat. Ann. § 5:5-130(b)(1)), which provided that permit holders would forfeit their rights to any OTW facility that was not licensed by January 1, 2012, unless the permit holder could demonstrate that it was "making progress" toward obtaining an off-track wagering license and establishing an OTW. The Forfeiture Amendment provided further that a permit holder's rights to an OTW facility, if forfeited, shall be made available to other "horsemen's organizations" without compensation to the permit holder.[2] The NJTHA is one such organization that would be entitled to any forfeited rights.

ACRA Turf Club, 748 F.3d at 128-30 (footnotes in original).

The bill containing the Forfeiture Amendment was conditionally vetoed but was thereafter clarified and passed to reflect that making "'progress' toward the establishment of such facilities" includes "negotiations concerning the transfer or assignment of off-track wagering licenses in the context of a potential sale or lease of a racetrack." App. at 199. Thus, entering into an agreement to sell or lease racetracks, which includes the transfer of licenses, qualifies as making progress and allows a party to avoid forfeiture. N.J. Stat. Ann. § 5:5-130(b)(1) (the "Sale/Lease Exemption").

In addition, the bill was amended to include the "Pilot Program."[3] As we explained:

[T]he New Jersey Legislature also passed the Pilot Program Act, 2011 N.J. Laws 228 (codified at N.J. Stat. Ann. § 5:5-186), which directed the [NJRC] to establish a three-year Pilot Program for the installation of electronic wagering terminals in a limited number of bars and restaurants. N.J. Stat. Ann. § 5:5-186. Participation in the Pilot Program was limited to lessees or

---

[2] A "horsemen's organization" is defined by the Simulcasting Racing Act, N.J. Stat. Ann. § 5:5-110 et seq., as an "organization or group representing a majority of horsemen engaged in competing for purses during a regularly scheduled horse race meeting, as the case may be." N.J. Stat. Ann. § 5:5-111.

[3] OTAWA was also amended to include what is referred to as the "Deposit Amendment," N.J. Stat. Ann. § 5:5-130(b)(1)), which is no longer at issue in this case.

purchasers of NJSEA-owned racetracks, who were permitted to exchange any unused OTW licenses for a license to install electronic wagering terminals. The NJTHA secured the right to a Pilot Program license by paying $2 million to the other assignee of NJSEA's licenses, the New Meadowlands Racetrack, LLC.

ACRA Turf Club, 748 F.3d at 130.

In January 2012, the NJRC

sent letters to ACRA, Freehold, and other OTW licensees, detailing the Forfeiture . . . Amendment[ ] and notifying each permit holder that it could extend its rights to establish licensed OTW facilities . . . by . . . demonstrating to the satisfaction of the [NJRC] that the permit holder had made progress toward establishing its share of OTW facilities. On March 29, 2012, ACRA and Freehold submitted petitions to the [NJRC] . . . seeking to demonstrate that they were making progress toward opening their remaining OTW facilities. In their respective petitions, ACRA and Freehold also challenged the constitutionality of the amendments under the Contracts, Takings, Due Process, and Equal Protection Clauses of the United States Constitution.

Id.

While the petitions were pending, Plaintiffs filed this suit and sought to enjoin enforcement of the amendments on the same constitutional grounds. With respect to the preliminary injunction motion, the District Court determined that Plaintiffs showed a likelihood of success on their Contract Clause and Takings Clause claims, but not on their Equal Protection and Due Process claims. ACRA Turf Club, LLC v. Zanzuccki, Civ. A. No. 12-2775 (JAP), 2012 WL 2864402, at *7-13 (D.N.J. July 11, 2012). It nevertheless denied the motion because there was no "immediate irreparable harm." Id. at *14. Thereafter, the District Court dismissed the complaint based on Younger abstention, see Younger v. Harris, 401 U.S. 37 (1971). ACRA Turf, LLC v. Zanzuccki, Civ. A. No. 12-2775 (MAS) (DEA), 2013 WL 2395058, at *3 (D.N.J. May 30, 2013),

rev'd, 748 F.3d 127 (3d Cir. 2014). We reversed and remanded. ACRA Turf Club, 748

F.3d at 141-42.

After remand, the parties moved and cross-moved for summary judgment on

Plaintiffs' claims that the Forfeiture Amendment and Pilot Program violated the Contract,

Takings, Equal Protection, and/or Due Process Clauses. The District Court held that the

Forfeiture Amendment and the Pilot Program did not violate any of these clauses and

granted summary judgment in favor of Zanzuccki. ACRA Turf Club, LLC v. Zanzuccki,

Civ. A. No. 12-2775 (MAS) (DEA), 2015 WL 6688036, at *3-4 (D.N.J. Oct. 30, 2015);

ACRA Turf Club, LLC v. Zanzuccki, Civ. A. No. 12-2775 (MAS) (DEA), 2015 WL

12724076, at *5-9 (D.N.J. Jan. 31, 2015). The Court denied Plaintiffs' request for

reconsideration of its order dismissing their Contract Clause claim. ACRA Turf Club,

LLC v. Zanzuccki, Civ. A. No. 12-2775 (MAS) (DEA), 2017 WL 1731692, at *2-3

(D.N.J. May 2, 2017).

Plaintiffs appeal the summary judgment and reconsideration orders.

II[4]

A

We exercise plenary review of the District Court's grant of summary judgment.

Resch v. Krapf's Coaches, Inc., 785 F.3d 869, 871 n.3 (3d Cir. 2015). We apply the

same standard as the District Court, viewing facts and drawing all reasonable inferences

in the non-movant's favor. Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 266-67

---

[4] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have
jurisdiction pursuant to 28 U.S.C. § 1291.

(3d Cir. 2005). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

B

We will first address Plaintiffs' contention that the District Court erroneously granted summary judgment to Zanzuccki on their Contract Clause claim.

1

The Contract Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Its language "is facially absolute," Energy Reserves Grp., Inc. v. Kan. Power & Light Co., 459 U.S. 400, 410 (1983), but "[t]he Clause is not . . . the Draconian provision that its words might seem to imply," Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 240 (1978). The Contract Clause does not prevent States from exercising the police powers vested in them "for the promotion of the common weal, or [that] are necessary for the general good of the public," even though contracts previously entered into may be affected. Id. at 241.

To "harmoniz[e] the command of the Clause with the necessarily reserved sovereign power of the states to provide for the welfare of their citizens," we apply the following three-part test to determine whether legislation violates the Contract Clause: "[1] whether the law has operated as a substantial impairment of a contractual relationship; [2] whether the government entity, in justification, had a significant and legitimate public purpose behind the regulation; and [3] whether the impairment is reasonable and necessary to serve this important public purpose." United Steel Paper &

7

Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Virgin Islands, 842 F.3d 201, 210 (3d Cir. 2016) (citation and internal quotation marks omitted); see Energy Reserves Grp., 459 U.S. at 411-13; U.S. Tr. Co. of N.Y. v. New Jersey, 431 U.S. 1, 19-30 (1977). With respect to reasonableness and necessity, we generally defer to legislative judgment. Energy Reserves Grp., 459 U.S. at 412-13. Nevertheless, "[c]omplete deference to a legislative assessment of reasonableness and necessity is not appropriate [when] . . . the State's self-interest is at stake," U.S. Tr. Co., 431 U.S. at 26, in which case "stricter scrutiny" applies, United Steel, 842 F.3d at 212.

2

Although the parties disagree about whether the Forfeiture Amendment is a substantial impairment to the Agreement, whether the Forfeiture Amendment was reasonable and necessary, and which level of scrutiny applies at the reasonable-and-necessary step, we need not wade into each disputed point. Assuming that the Forfeiture Amendment substantially impairs Plaintiffs' rights under the Agreement, it has a valid purpose and we conclude that it is necessary and reasonable regardless of whether we completely defer to the legislature's judgment or instead apply stricter scrutiny. We reject Plaintiffs' arguments to the contrary.

Plaintiffs assert that the Legislature could have used incentives (a "carrot"), rather than forfeiture (a "stick"), as a means to get Plaintiffs to build OTWs more quickly. The Contract Clause, however, "does not require courts . . . to sit as superlegislatures, choosing among various options proposed by plaintiffs." United Steel, 842 F.3d at 213 (citation, internal quotation marks, and brackets omitted). In any event, we cannot say

8

Plaintiffs' preference for a "carrot" should be viewed as more appropriate than the "stick" approach taken by the Legislature. Put simply, why should a party who is entitled to undertake a task deserve an additional incentive to do so? The Legislature chose a means to accomplish its goal of expediting the establishment of OTW facilities and Plaintiffs have not shown that anything short of forfeiture would have achieved that goal.

Moreover, the amendment is reasonable. Legislation affecting contract rights can be reasonable when circumstances change in "kind" rather than in "degree." Cf. U.S. Tr. Co., 431 U.S. at 32 ("[T]hese concerns were not unknown [when the covenant was enacted], and the subsequent changes were of degree and not of kind."); United Steel, 842 F.3d at 214 (concluding that the Virgin Islands's "precarious" financial condition was known when the contract was entered into and the worsening of its financial condition was "not a change in the kind of problem that [the legislation] sought to solve. It is a change in degree. Under United States Trust, this change in degree is not enough to render the impairment 'reasonable in light of changed circumstances'" (quoting U.S. Tr. Co., 431 U.S. at 32) (emphasis omitted)). Here, the changed circumstances are a change in "kind" because in enacting the Forfeiture Amendment, the Legislature was responding to the stalling of OTW licensing, rather than a previously-existing situation in the horse racing industry that worsened after the Act was passed. OTW facilities were established at a slow pace after OTAWA was enacted, and prodding Plaintiffs to make progress toward obtaining their licenses, or risk forfeiting them, is not an unreasonable means of addressing the slow movement and promoting the economic growth of the State's horse racing industry.

For these reasons, the Forfeiture Amendment does not violate the Contract Clause.

3

The Pilot Program also does not violate the Contract Clause because the program does not impair Plaintiffs' rights under the Agreement. To determine whether legislation has substantially impaired contract rights, "we ask whether legitimate expectations have been thwarted." United Steel, 842 F.3d at 210. Here, no such expectations have been thwarted. The program permitted the lessee or purchaser of an NJSEA-owned racetrack to use one unused license to establish up to 12 OTW facilities with up to 20 total OTW terminals. N.J. Stat. Ann. § 5:5-186(a)-(b). Importantly, those facilities could be established only within NJSEA's territory under the Agreement, which is the northern part of the State. Id. While Plaintiffs were not allowed to participate in the program, they had no expectation that they could engage in OTW activities in NJSEA's territory. Furthermore, the Pilot Program did not affect Plaintiffs' existing facilities or their ability to obtain licenses for and establish OTW facilities in the geographic areas assigned to them. Plaintiffs therefore retained their full rights under the Agreement, and thus the Pilot Program did not impair their contractual rights. Therefore, it does not violate the Contract Clause.[5]

---

[5] Plaintiffs assert that the District Court's conclusions in its preliminary injunction decision that they had a likelihood of success on their Contract Clause and Takings Clause claims, ACRA Turf Club, 2012 WL 2864402, at *7-12, are the law of the case. Plaintiffs are mistaken: a court's findings of fact and conclusions of law made in connection with a request for a preliminary injunction do not bind that court's rulings on the merits. See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981); Council of Alternative Political Parties v. Hooks, 179 F.3d 64, 69-70 (3d Cir. 1999).

C

The Forfeiture Amendment also does not violate the Takings Clause. The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. It applies to the States through the Fourteenth Amendment. Chicago, B. & Q. R. Co. v. City of Chicago, 166 U.S. 226, 241 (1897). "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 537 (2005). Government regulation also "may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster," and "such 'regulatory takings' may be compensable under the Fifth Amendment." Id. The Supreme Court has set forth certain "guidelines" for determining whether a government regulation effects a taking. Murr v. Wisconsin, 137 S. Ct. 1933, 1942 (2017). As relevant here,

> when a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found based on a complex of factors, including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action.

Id. at 1943 (citation and internal quotation marks omitted).

Applying these guidelines to the facts of this case, we conclude that the Forfeiture Amendment did not effect a taking. First, the amendment does not alter Plaintiffs' existing OTW licenses and facilities. Because it did not affect Plaintiffs' ability to continue to profit from their Vineland and Toms River facilities, the Forfeiture

11

Amendment did not have any immediate economic impact on them.  Second, Plaintiffs have not asserted that the amendment has interfered with their investment-backed expectations.  Indeed, the Forfeiture Amendment required them only to make progress toward obtaining their licenses and did not actually require that they build or open the facilities on any particular timeline.  Moreover, the Forfeiture Amendment has not been enforced, so any interference with their investment plans remains hypothetical.  See Murr, 137 S. Ct. at 1943.  Third, the character of the State's action here does not indicate a taking because there has been no actual encroachment on or diminishment of Plaintiffs' property.  The amendment works to speed up Plaintiffs' licensing process, or allow those licenses to be in other hands, but it does not interfere with their existing facilities or decrease the value of the licenses still available to them.

Because there was no taking, the District Court correctly granted summary judgment to Zanzuccki on Plaintiffs' Takings claim.

D

The District Court also appropriately granted summary judgment on Plaintiffs' Equal Protection claim.  The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  In considering Equal Protection challenges to state legislation, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  City of Cleburne, Texas v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985).  The Equal Protection Clause gives States "wide latitude" regarding

12

social or economic legislation, id.; indeed, "rational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," Heller v. Doe, 509 U.S. 312, 319 (1993) (citation and internal quotation marks omitted). We must uphold a classification "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Id. at 320 (citation and internal quotation marks omitted).

The Pilot Program arguably favors one class of OTW participants over another because it allows the lessee or purchaser of an NJSEA-owned racetrack, and not Plaintiffs, to use one unused license to establish up to 12 OTW facilities with up to 20 total OTW terminals within NJSEA's territory under the Agreement. See N.J. Stat. Ann. § 5:5-186(a)-(b). Although the program treated Plaintiffs differently in this respect, it did not affect their rights under the Agreement because they had no right to operate OTW facilities in NJSEA's territory. In addition, the program had no impact on Plaintiffs' ability to establish licensed OTW facilities in the areas of the State assigned to them. Moreover, the Pilot Program is rationally related to the interest of promoting the horse racing industry because only four OTW facilities had been established and the Legislature's experiment with an NJSEA-affiliated entity could lead to the establishment of additional OTW facilities and boost New Jersey horse racing. Thus, the District Court did not err in determining that the interest of invigorating this aspect of the State's economy is a legitimate state interest, and the Pilot Program is a rational means of furthering that interest. See Cleburne, 473 U.S. at 440.

The Sale/Lease Exemption also does not deny Plaintiffs equal protection. Any party to the Agreement can show that it is making progress, and thus be exempt from forfeiture, by demonstrating that it entered or is about to enter into an agreement to sell or lease their racetracks and transfer the licenses. N.J. Stat. Ann. § 5:5-130(b)(1). Although the exemption was enacted with NJSEA in mind, it is available to any entity, including Plaintiffs, and so it does not treat Plaintiffs differently from NJSEA. Therefore, the Sale/Lease Exemption does not violate the Equal Protection Clause, and the District Court properly granted summary judgment to Zanzuccki on this claim.

E

The District Court correctly held that the Forfeiture Amendment does not violate the Due Process Clause. The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Clause contains both procedural and substantive components. See Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff, 669 F.3d 359, 366 (3d Cir. 2012). When a party lodges a Due Process challenge to a legislative action, as here, the act is subject to rational-basis review and, to establish its legality, "the defendant must demonstrate (1) the existence of a legitimate state interest that (2) could be rationally furthered by the statute." Id. We cannot second-guess the Legislature's factual assumptions or policy considerations that underlie the statute. Sammon v. N.J. Bd. of Med. Exam'rs, 66 F.3d 639, 645 (3d Cir. 1995).

The Legislature enacted the Forfeiture Amendment with the explicit intent to promote the State's horse racing industry. N.J. Stat. Ann. § 5:5-128(b). As noted above,

14

this is a legitimate state interest. The Forfeiture Amendment rationally supports that interest because making licenses available to horsemen's organizations if Plaintiffs failed to make progress toward obtaining their licenses could speed the process of establishing additional OTW facilities. Accordingly, the amendment survives rational-basis review and the District Court did not err in so concluding.[6]

III

For the foregoing reasons, we will affirm.

---

[6] Because the District Court correctly granted summary judgment in Zanzuccki's favor, it did not err in declining to reconsider its ruling.