PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-4357
_____

UNITED STEEL PAPER AND FORESTRY RUBBER
MANUFACTURING ALLIED INDUSTRIAL AND
SERVICE WORKERS INTERNATIONAL UNION AFL-
CIO- CLC,

Appellant

v.

GOVERNMENT OF THE VIRGIN ISLANDS;
GOVERNOR OF THE VIRGIN ISLANDS;
ANGEL DAWSON, Finance Commissioner;
DEBRA GOTTLIEB, Director of Management and Budget
_____

No. 14-4358
_____

ST. CROIX FEDERATION AFT LOCAL 1826;
ROSA SOTO-THOMAS,

Appellants

v.

GOVERNOR OF THE VIRGIN ISLANDS; VI COMM. OF

FINANCE ANGEL DAWSON, JR.; DIR. OF VIOMB
DEBRA GOTTLIEB; 29TH LEGISLATURE OF THE
VIRGIN ISLANDS; VIRGIN ISLANDS DEPARTMENT
OF EDUCATION; GOVERNMENT OF THE VIRGIN
ISLANDS

On Appeal from the District Court
of the Virgin Islands
(D.V.I. No. 3-11-cv-00076)
(D.V.I. No. 3-11-cv-00079)
District Judge:  Honorable Curtis V. Gomez
_____

Argued:  December 8, 2015
Before:  FISHER, KRAUSE and ROTH, *Circuit Judges*.

(Filed: November 15, 2016)

Nathan L. Kilbert, Esq. *[ARGUED]*
Daniel M. Kovalik, Esq.
United Steelworkers of America
Five Gateway Center
60 Boulevard of Allies, Room 807
Pittsburgh, PA 15222

   *Counsel for Appellant United Steel Paper
   and Forestry Rubber Manufacturing Allied Industrial
   and Service Workers International Union AFL-CIO-
   CLC*


Amos W. Carty, Jr., Esq.
Law Offices of Richard P. Bourne-Vanneck

9800 Buccaneer Mall, Suite 9
St. Thomas, VI 00802

> *Counsel for Appellant St. Croix Federation AFT Local 1826 and Rosa Soto-Thomas*

Joss N. Springette, Esq.
Office of Collective Bargaining
3438 Kronprindsens Gade, Second Floor
St. Thomas, VI 00802

Samuel A. Walker, Esq. *[ARGUED]*
Office of Attorney General of Virgin Islands
6040 Castle Coakley
Christiansted, VI 00820
> *Counsel for Appellees*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

In 2011, the Virgin Islands faced a severe budget crisis as a result of the economic recession. In response to this crisis, the Government of the Virgin Islands enacted the Virgin Islands Economic Stability Act of 2011 ("VIESA"),

2011 V.I. Sess. Laws 84, which reduced most Government employees' salaries by 8%. Many of the Government employees, however, were covered by collective bargaining agreements negotiated on their behalf by their representative unions. The collective bargaining agreements, agreed to and signed by the Governor on behalf of the Government, set forth detailed salary and benefit schedules to be paid to covered Government employees.

The unions brought suit alleging that the salary reductions in VIESA constituted an impermissible impairment of the collective bargaining agreements, in violation of the Contract Clause of the United States Constitution. The District Court, after a bench trial, held that VIESA did not violate the Contract Clause. We will reverse.

I.

A.

Beginning in 2009, the Virgin Islands experienced a fiscal crisis: for the fiscal year 2009, the Government projected a budget deficit in excess of $300 million; in 2010, the deficit was $275 million; in 2011, after initially predicting a small surplus, a revised report projected a $75.1 million deficit for 2011 and a $131.5 million deficit for 2012. On February 22, 2010, Debra Gottlieb, from the Government's Office of Management and Budget, testified before the Virgin Islands Legislature. She warned the Legislature of the financial crisis, stating that "the territory's cash balances are precariously low," App. 321, 328, and that the operating deficit for fiscal year 2009 was estimated to be $159 million. She predicted that the operating deficit would continue throughout fiscal year 2011.

4

As an initial response to the crisis, on June 5, 2009, the Virgin Islands Legislature authorized the Governor to borrow up to $500 million. Despite borrowing, the situation continued to worsen, and so from December 30, 2010, to June 21, 2011, the Government undertook additional measures to combat the deficit. It imposed a marine terminal user's tax of $1 per cruise ship passenger; reduced appropriations to the executive branch by 3%, or $17.7 million; reduced appropriations to the judicial branch by 3%, or $1.1 million; increased the tax on all gross receipts from 4% to 4.5%; increased the hotel tax from 8% to 10%; increased marriage licensing fees, liquor-licensing fees, court filing fees, fines for traffic violations, and the motor-vehicle rental surcharge; and reduced its expenditures related to its employment functions, including limiting energy consumption, freezing all hires, and cutting back on training and travel.

Notwithstanding these measures, the Government projected a deficit of $17.4 million for 2011, $90.1 million for 2012, and $49.9 million for 2013. In response, the Government considered implementing several additional cost-cutting measures, including laying off 600 Government employees, eliminating some or all of the eighteen paid Government holidays, instituting furloughs and workweek reductions for Government employees, and increasing the gross-receipts tax. By June 21, 2011, the Governor had exhausted his $500 million statutory borrowing authorization, and the Government had made only interest payments on its debt.

## B.

The Government ultimately rejected these cost-cutting measures, and instead adopted VIESA. Under VIESA, all employees of the executive and legislative branches of the Government whose annual salary exceeded $26,000 would

5

receive an 8% reduction in pay, but no employee's salary would be reduced below $26,000. The legislation also allowed any employee who had attained thirty years or more of service to retire and receive a one-time payment. As a result of VIESA, the Government projected savings of approximately $28 million annually. VIESA passed the Legislature on June 22, 2011, and was signed into law by the Governor on July 5, 2011. The salary reductions contained in VIESA expired on July 3, 2013.

## C.

Many of the affected union employees were subject to collective bargaining agreements. Relevant for our purposes, the Appellants—United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW"), the American Federation of Teachers Local 1826 ("AFT"), and one of AFT's vice presidents (collectively, the "Unions")—had negotiated collective bargaining agreements on their members' behalf.

USW is party to four collective bargaining agreements: a Master agreement, which covers all 1,000 employees and became effective on October 1, 2009; a Supervisors agreement, effective on October 1, 2005 and set to expire on September 30, 2008, but later extended on a day-to-day basis; a Non-Supervisors agreement, effective on October 1, 2008; and an Enforcement Officers agreement, effective on October 1, 2009. The Master and Non-Supervisors agreements were concluded in October 2010.

The USW collective bargaining agreements set forth detailed payment schedules that specify the wages or salaries and benefits for all of the employees covered in the agreements. The Master agreement called for a 2.5% pay increase from the previous year. The USW Supervisors, Non-

6

Supervisors, and Enforcement Officers collective bargaining agreements provide that the Government may reduce the workforce through layoffs; they also provide that the member employees will not strike during the duration of the agreement. Those three agreements further set forth grievance and arbitration procedures that allow for adjudication of any dispute. The Non-Supervisors and Enforcement Officer agreements provide that no modification to the agreement is effective unless agreed to in writing by both USW and the Government; the Supervisors agreement states that the parties are bound by the agreement and will comply with all terms and conditions in the agreement.

AFT is party to three collective bargaining agreements—one for each type of employee it represents: professionals, paraprofessionals, and support staff. All three collective bargaining agreements were effective September 1, 2007, and set to expire on August 31, 2011, but have been extended on a day-to-day basis. These collective bargaining agreements were concluded in May 2009, but they were made retroactively effective from September 1, 2007.

Like the USW agreements, the AFT collective bargaining agreements set forth detailed payment plans for wages or salaries and benefits of its members. They provide that the employees will not strike for the duration of the agreement, and they set forth arbitration procedures for any dispute involving the collective bargaining agreements. All of the AFT agreements require that any modification be in writing and agreed to by all parties.

D.

Shortly after VIESA's enactment, USW, AFT, and other collective bargaining representatives filed suit in the District Court of the Virgin Islands, and their cases were

7

consolidated.[1] The Union-plaintiffs alleged that VIESA violates the Contract Clause, the Fifth Amendment's Takings Clause, due process, equal protection, the separation-of-powers doctrine, and 42 U.S.C. § 1983. They also alleged that VIESA constitutes a breach of contract and a breach of the duty of good faith and fair dealing.

On December 5, 2011, the District Court held a one-day bench trial. It rendered its judgment on March 29, 2012. In its opinion, the District Court first addressed the Union-plaintiffs' Contract Clause claim and found that, although VIESA substantially impaired the collective bargaining agreements, such impairment was justified and did not violate the Contract Clause. It also held that VIESA did not violate the Takings Clause, procedural due process, and substantive due process. Accordingly, the District Court dismissed those federal constitutional claims.

USW brought an appeal to this Court, which we dismissed for lack of jurisdiction because the other Union-plaintiffs' territorial claims were still pending before the District Court. On September 30, 2014, following our dismissal of the initial appeal, the District Court dismissed all of the territorial claims. The court also dismissed the separation-of-powers claim because, since no injunctive or declaratory relief could be granted as a result of VIESA's expiration, the claim was moot. On all the other claims, jurisdiction was proper, but they were nonetheless dismissed. AFT and USW timely appealed.

---

[1] In addition to AFT and USW, several other unions brought suit in the District Court. We refer to those plaintiffs below as the "Union-plaintiffs." For purposes of our case, only AFT, AFT's vice president, and USW appealed the District Court's judgment.

## II.

We review the District Court's findings of fact for clear error and exercise plenary review over the District Court's conclusions of law. *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 514-15 (3d Cir. 2012). The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.[2]

The Government argues that this case is moot, thus depriving this Court of subject-matter jurisdiction. Because Article III of the Constitution limits the jurisdiction of federal courts to certain "Cases" or "Controversies," U.S. Const. art. III, § 2; *see also Rendell v. Rumsfeld*, 484 F.3d 236, 240 (3d Cir. 2007), we must determine, before reaching the merits, whether this appeal presents a justiciable case or controversy.

The constitutional requirement that the exercise of

---

[2] We perceive no obstacle to the Unions' suit posed by the Eleventh Amendment because the Revised Organic Act of the Virgin Islands—which extends constitutional provisions to the Virgin Islands and does not expressly provide Eleventh Amendment protection, *see* 48 U.S.C. § 1561—authorizes suits against the Virgin Islands "arising out of contract," *id.* § 1541(b). Thus, even if the Eleventh Amendment did apply to the Virgin Islands—a question we do not decide today—the Revised Organic Act indicates that Contract Clause violations would fall outside the scope of the Amendment's protection. *Cf. United States v. Government of Virgin Islands*, 363 F.3d 276, 286-87 (3d Cir. 2004) (declining to decide whether the Eleventh Amendment applies to the Virgin Islands); *Fleming v. Dep't of Pub. Safety*, 837 F.2d 401, 407 (9th Cir. 1988) (concluding the Northern Mariana Islands lack Eleventh Amendment immunity because it was not expressly conferred upon them).

judicial power depends upon the existence of a case or controversy has three elements: "(1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) a legal controversy with sufficiently adverse parties so as to sharpen the issues for judicial resolution." *Int'l Bhd. of Boilermakers v. Kelly*, 815 F.2d 912, 915 (3d Cir. 1987) (quoting *Dow Chem. Co. v. EPA*, 605 F.2d 673, 678 (3d Cir. 1979)). A case is moot when "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (internal quotation marks omitted). "The central question of all mootness problems is whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." *Rendell*, 484 F.3d at 240 (internal quotation marks omitted). "[I]f a case becomes moot after the District Court enters judgment, an appellate court no longer has jurisdiction to review the matter on appeal." *Id.* at 241.

The Government argues that this case is moot because, since the District Court rendered its judgment, VIESA has expired. The Unions present two bases on which, despite VIESA's expiration, we may reach the merits: (A) the "capable of repetition, yet evading review" exception to mootness applies; and (B) the case is not moot because our decision here will affect collateral arbitration proceedings between the same parties.

## A.

A case is not necessarily moot simply because the challenged law has expired; "if the underlying dispute between the parties is one 'capable [of] repetition, yet evading review,' it remains a justiciable controversy within

10

the meaning of Article III." *N.J. Turnpike Auth. v. Jersey Cent. Power & Light*, 772 F.2d 25, 31 (3d Cir. 1985) (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 546 (1976)). The "capable of repetition, yet evading review" exception to the mootness doctrine applies "only in exceptional situations, where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) (brackets and internal quotation marks omitted); *see Rendell*, 484 F.3d at 241.

The Unions argue that this case triggers the "capable of repetition, yet evading review" exception because the short duration of VIESA means that it, or similar legislation, could never be reviewed. The continued financial problems facing the Virgin Islands make it plausible that the Virgin Islands will enact new wage-reduction legislation despite being party to collective bargaining agreements.

We agree that the duration of VIESA—two years—is too short to be fully litigated prior its expiration. That much is clear from the procedural history of this case. The Unions filed suit immediately after VIESA was enacted in July 2011, and the District Court resolved the federal claims, including the Contract Clause claim, on March 29, 2012, and the remaining territorial claims on September 30, 2014. The Unions timely appealed, but VIESA had expired over a year prior to the notice of appeal.

The more difficult question is whether this case meets the second prong of the two-part test: is there a reasonable expectation that the Unions will be subject to the same action? For the alleged harm to occur again, the Government would have to pass another law calling for another round of

wage reductions that affects the same Union employees. But the mere power to reenact a challenged law is not enough. "Rather, there must be evidence indicating that the challenged law likely will be reenacted." *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997). The Unions claim that new "wage-reduction legislation is entirely plausible in view of the fiscal crisis facing the Virgin Islands." Unions' Supp. Letter Br. 4. For example, the Unions point to statements made by the Governor in his State of the Territory Address that "our government is teetering on the brink of financial collapse," and "our territory has never been in such a state in its history." *Id.* (brackets omitted). But these statements show only that the Virgin Islands' economy remains in a perilous state; they do not show that this new wage-reduction legislation is likely to be enacted. Similarly, the Governor's statement that "even meeting the government's payroll will continue to be a challenge," *id.*, is simply an observation of the financial situation facing the Virgin Islands, not evidence that the Legislature might pass new legislation similar to VIESA. The Unions provide no basis on which we can determine that they could reasonably expect to be subject to VIESA-like legislation again. Without such evidence, we are left to speculate. That is not enough to trigger the "capable of repetition, yet evading review" exception to the mootness doctrine.

B.

Even if this case is not "capable of repetition, yet evading review," the Unions argue that it is not moot because this Court's decision will have collateral legal consequences, namely, that it will affect the Unions' rights in a pending arbitration before the Virgin Islands Public Employee Relations Board in which the Unions are challenging VIESA's wage cuts.

12

An action is not moot if it will have collateral legal consequences. *Nat'l Iranian Oil Co. v. Mapco Int'l, Inc.*, 983 F.2d 485, 490 (3d Cir. 1992). In *National Iranian Oil*, we held that the case was not moot because, *inter alia*, the district court's order below would have possible collateral legal consequences in the form of collateral estoppel in future actions. *Id.* National Iranian Oil had petitioned the district court to compel arbitration of a contract dispute with Mapco. The district court dismissed National Iranian Oil's petition as untimely based on its holding that the three-year Delaware statute of limitations applied to the action, rather than the ten-year Iranian statute of limitations urged by National Iranian Oil, who had filed its petition six years after the relevant events. In response to this decision, National Iranian Oil filed two additional lawsuits in other federal district courts for the same breach of contract claim for which it sought arbitration. Because the "district court's holding that the Iranian statute of limitations does not apply would have a collateral estoppel effect in those actions and could result in their dismissal," we held that the action was not moot. *Id.*

Likewise, in our case, the District Court's holding that VIESA does not violate the Contract Clause will have collateral legal consequences on the binding arbitration between the Unions and the Government, which is set to take place before the Public Employee Relations Board. In the arbitration, the Unions allege that the Government failed to pay the covered employees their full wages and salaries due to them. The arbitrator's decision will likely depend on the validity of VIESA. But the Public Employee Relations Board may not adjudicate the constitutionality of VIESA because it lacks the authority to do so. As a result, a decision here is necessary to provide a preclusive effect in the binding

13

arbitration.[3] Therefore, the case is not moot, and we may proceed to the merits.

### III.

The Contract Clause provides that no State shall pass any law "impairing the Obligation of Contracts." U.S. Const. art. I, § 10.[4] Although the Clause speaks in absolute terms, it is not "the Draconian provision that its words might seem to imply." *Allied Structural Steel Co. v. Spannus*, 438 U.S. 234, 240 (1978). The Contract Clause "does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public," even though contracts previously entered into may be affected. *Id.* at 241 (internal quotation marks omitted). Thus, the Contract Clause "does not trump the police power of a state to protect the general welfare of its citizens." *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 367 (2d Cir. 2006).

The Supreme Court has developed a three-part analysis "for harmonizing the command of the Clause with the necessarily reserved sovereign power of the states to provide for the welfare of their citizens." *Balt. Teachers Union v. Mayor & City Council of Balt.*, 6 F.3d 1012, 1015 (4th Cir. 1993) (internal quotation marks omitted). To determine whether legislation violates the Contract Clause, this Court must analyze whether the law has operated as a substantial

---

[3] The Government and Unions both agreed to stay the arbitration pending the outcome of this appeal.

[4] The Contract Clause was made applicable to the Virgin Islands in 1954 through section 3 of the Revised Organic Act of the Virgin Islands, 48 U.S.C. § 1561. *See West Indian Co. v. Government of Virgin Islands*, 844 F.2d 1007, 1016 (3d Cir. 1988).

impairment of a contractual relationship; whether the government entity, in justification, had a significant and legitimate public purpose behind the regulation; and whether the impairment is reasonable and necessary to serve this important public purpose. *See Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-13 (1983); *Nieves v. Hess Oil V.I. Corp.*, 819 F.2d 1237, 1243 (3d Cir. 1987).

A.

The Government conceded before the District Court that the collective bargaining agreements entered into with the Unions constitute contractual relationships and that, if any impairment of the contractual relationship existed, such impairment was substantial. App. 32. Therefore, for our purposes, we must decide only whether VIESA impaired the collective bargaining agreements. We have no trouble concluding that it did.

To assess whether there has been an impairment of a contractual relationship, we ask whether legitimate expectations have been thwarted. *See Transp. Workers Union of Am., Local 290 ex rel. Fabio v. Se. Pa. Transp. Auth.*, 145 F.3d 619, 622 (3d Cir. 1998). The collective bargaining agreements set forth detailed payment and benefits schedules at which the Union employees were to be compensated. The Government agreed to the collective bargaining agreements and had already approved the appropriations to pay those salaries. In exchange for the agreed-upon salaries, the Union employees made various concessions, including their right to strike. In return for those concessions, the Union employees expected that they would receive the salary provided for in the collective bargaining agreements. *See Buffalo Teachers Fed'n*, 464 F.3d at 368 ("The promise to pay a sum certain constitutes not only the primary inducement for employees to

enter into a labor contract, but also the central provision upon which it can be said they reasonably rely.").[5]

Moreover, the collective bargaining agreements provided that they could not be modified without mutual assent. As a result, the Government lacked the unilateral power to alter the employees' salaries. The Union employees' expectation that they would receive the benefit of their bargain without unilateral modification by the Government was therefore a reasonable expectation. *Compare Transp. Workers*, 145 F.3d at 622 (holding that, because the government retained the power to modify the contracts without the plaintiffs' agreement, the plaintiffs had no reasonable expectations that could be thwarted), *with Balt. Teachers Union*, 6 F.3d at 1015 ("Only if the employees' salaries were subject to unilateral adjustment by the City under the terms of the contract could it possibly be concluded [that there was no impairment of the contracts at issue].").

We therefore find that VIESA impaired the collective bargaining agreements. Because the Government stipulated

---

[5] Other courts have consistently found that contracts were impaired where compensation levels called for in the contracts were reduced. *E.g.*, *Balt. Teachers Union*, 6 F.3d at 1018 (finding that "[i]n the employment context, there likely is no right … more central to the contract's inducement" than the right to compensation, and holding that salary reductions constituted a substantial impairment); *Condell v. Bress*, 983 F.2d 415, 419 (2d Cir. 1993) (holding that a payroll lag whereby union employees were paid 90% of their salary and received the withheld 10% of their pay at the termination of their employment constituted a substantial impairment); *Ass'n of Surrogates & Supreme Court Reporters v. New York*, 940 F.2d 766, 772 (2d Cir. 1991) (same).

that, should we find the collective bargaining agreements were impaired, such impairment was substantial, the first prong of the three-part test is met.

## B.

Because we find that VIESA substantially impaired the collective bargaining agreements, we must next determine whether the Government had a significant and legitimate public purpose in enacting VIESA. A legitimate public purpose is one aimed at remedying a broad and general social or economic problem; it need not be addressed to an emergency or temporary situation. *See Energy Reserves Grp.*, 459 U.S. at 411-12. The record in this case is replete with evidence that the Virgin Islands faced an immediate fiscal problem that needed to be addressed, and the Unions do not dispute that VIESA was enacted to address this significant and legitimate public purpose.

## C.

That VIESA was aimed at a significant and legitimate public purpose does not end our inquiry. Once a legitimate public purpose has been identified, we must then decide whether the impairment is both necessary and reasonable to meet the purpose advanced by the Government in justification. *See U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 22 (1977) ("Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption."); *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 386 (3d Cir. 2012) ("[T]he court must ascertain 'whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in light of that purpose.'" (quoting *Transp. Workers*, 145 F.3d at 621)).

When determining whether legislation is necessary and

17

reasonable, the State is ordinarily entitled to deference in its legislative judgment. However, when the State itself is a contracting party, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *U.S. Trust*, 431 U.S. at 26. If we afforded complete deference to the State in such a case, "a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, [and] the Contract Clause would provide no protection at all." *Id.* For this reason, when a State is a contracting party, its "legislative judgment is subject to stricter scrutiny than when the legislation affects only private contracts." *Nieves*, 819 F.2d at 1249. Despite our more exacting scrutiny, some deference is appropriate, and the inquiry becomes "whether a less drastic modification would be sufficient and whether the legislation was reasonable in light of changed circumstances." *Keystone Bituminois Coal Ass'n v. Duncan*, 771 F.2d 707, 717 (3d Cir. 1985).

1.

We first consider whether VIESA was necessary. To determine whether the impairment was necessary, our task is two-fold. First, we must ensure that the Government did not "consider impairing the obligations of [its] contracts on a par with other policy alternatives." *Balt. Teachers Union*, 6 F.3d at 1020 (quoting *U.S. Trust*, 431 U.S. at 30-31). Second, we must consider whether the Government imposed a drastic impairment when an "evident and more moderate course would serve its purposes equally well." *Id.* (quoting *U.S. Trust*, 431 U.S. at 31).

We have reason here to be concerned that the Government considered impairing the collective bargaining agreements on a par with other policy alternatives. While the

18

Government clearly implemented the various measures described above in an attempt to raise revenue and alleviate the effects of the fiscal crisis before it implemented VIESA and the record reflects it considered some additional measures as alternatives to VIESA, the record also indicates that Government officials did not place impairment of the agreements in a category separate from other policy options. For example, Debra Gottlieb testified that the Governor's economic policy team gave no "special consideration" to policy options that would not alter the agreements, but rather "considered all options available to the Government." App. 869; *see also* App. 938 (Member of Governor's economic team indicating the Government never even considered eliminating tax breaks before pursuing VIESA, thereby placing contractual impairment above other policy options.).

There is also reason for concern here that, as the Unions claim, the Government imposed a more drastic impairment than was necessary. The Unions argue, for example, that the Government could have laid off 600 Government employees, resulting in $30 million of savings; furloughed some employees using the layoff provisions in the collective bargaining agreement; and reduced the number of paid Government holidays. Tax increases and renegotiation of the collective bargaining agreements present other alternatives the Government could have explored and, perhaps, discarded after thoughtful review. *See, e.g.*, *U.S. Trust*, 431 U.S. at 30 n.29, 32 (raising the possibility that tax increases could have been used to avoid impairing a contract); *Sidamon-Eristoff*, 669 F.3d at 388 (considering policies used in other States as potential alternatives). In dismissing the Unions' policy alternatives, the District Court observed that proposals such as additional taxing, borrowing, furloughs, and layoffs could have resulted in a greater net reduction in

pay for Government employees, while at the same time reducing the Government's ability to provide basic services. App. 49-51. The absence of any feasibility studies, which it appears were not commissioned by the Government, not only deprives us of any meaningful way to corroborate the District Court's assessment, but also reinforces our concern that the Legislature indeed may have imposed a more drastic impairment than necessary and may not have adequately considered alternatives before impairing its contractual obligations.

That said, these are close and difficult decisions for any legislature to make in the face of a financial crisis, and VIESA provides a close case as to the necessity inquiry. The courts are tasked with assessing the necessity of a given impairment and do not accord legislatures "complete deference," *U.S. Trust*, 431 U.S. at 26—particularly where, as here, a State or territory is itself a party to the contract it seeks to abrogate. But the Contract Clause also "does not require the courts … to sit as superlegislatures," choosing among various options proposed by plaintiffs, as "we [are] ill-equipped even to consider the evidence that would be relevant to such conflicting policy alternatives." *Balt. Teachers Union*, 6 F.3d at 1021-22.

Fortunately, we need not decide today whether—despite our concerns—VIESA was necessary because, as explained below, we conclude it was unreasonable, which is alone sufficient to render it improper under the Contract Clause. Thus, for purposes of this analysis, we assume without deciding that VIESA was necessary and move on to consider its reasonableness.

2.

Even assuming VIESA was necessary, the Government is not entitled to impair its contracts at will. The

20

Contract Clause is not toothless. In addition to being a necessary impairment, any impairment must also be reasonable, and it "is not a reasonable one if the problem sought to be resolved by an impairment of the contract existed at the time the contractual obligation was incurred." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1107 (9th Cir. 1999) (internal quotation marks omitted); *see also U.S. Trust*, 431 U.S. at 31.

In *United States Trust*, the Supreme Court held that New Jersey's impairment of its covenant was unreasonable because, *inter alia*, the problem the impairment was meant to remedy was well known when New Jersey agreed to the covenant it impaired. 431 U.S. at 31-32. New Jersey enacted the law at issue to repeal a covenant between itself and New York that limited the ability of the two states to subsidize transportation. *Id.* at 3, 13-14. New Jersey claimed that doing so served an important public purpose—the need for mass transportation in the New York metropolitan area. *Id.* at 29-30. The Court, however, found that, because the need for mass transportation had been well known for many years, including when New Jersey entered into the covenant with New York, changed circumstances could not justify impairing its covenant. *Id.* at 31-32. Thus, the law at issue was not reasonable, and it violated the Contract Clause.

In this case, the Government claims that VIESA was necessary because of the economic crisis and severe budget deficits. But to pass muster under our Contract Clause analysis, the impairment must be reasonable, in addition to being necessary. Even assuming VIESA was necessary to address the economic crisis and severe budget deficits, the Government knew of the economic crisis facing the Virgin Islands at the time it was negotiating with the Unions and when it concluded the collective bargaining agreements with

21

USW and AFT.

As to USW, there is extensive evidence demonstrating the Government's knowledge of the budget crisis at the time the Government agreed to provide a 2.5% salary increase to USW employees—as indicated by the USW Master agreement—on October 23, 2010. Prior to those agreements and as early as 2009, the Government had already projected significant budget deficits. Revenue had fallen by 30%—more than $250 million. And on February 22, 2010, Debra Gottlieb testified before the Legislature regarding the Virgin Islands' difficult financial situation. Gottlieb warned that the Government's "cash balances are precariously low." App. 321. She further cautioned that "the operating deficit is expected to continue throughout fiscal year 2011." App. 322. Gottlieb's testimony expressly indicated that one possibility for addressing the crisis was to implement "an across the board payroll reduction that equated to a 10% salary reduction," which "would yield approximately $51.7 million in expenditure reductions." App. 325. At this point, as shown by Gottlieb's testimony, both the Governor—who signed the agreements—and the Legislature—which later voted to impair them—were fully aware from the outset that tax revenues continued to decline, and that in order to maintain a balanced budget, the Virgin Islands would have to significantly increase revenue or substantially reduce expenditures. And apart from Gottlieb's presentation, the Governor had already been authorized to borrow $500 million to alleviate some of the Government's budget shortfalls, which were predicted for the upcoming years.

With respect to the AFT collective bargaining agreements, although these agreements were concluded earlier, in May 2009, the timing is nearly as suspect. In May 2009, the economic recession was in full swing. The

Legislature initially authorized the Governor to borrow $500 million in early June 2009, only a few weeks after the Governor signed the AFT agreements. It was obvious then that the Virgin Islands' budget crisis would require legislative action. And the Government already knew that revenue had dropped sharply. Despite its knowledge of the financial difficulties, the Government nevertheless entered into the collective bargaining agreements.

Even if the crisis worsened after the collective bargaining agreements were approved, we would not alter our conclusion. The Government knew it was facing severe budget deficits and that the financial condition of the Virgin Islands was precarious. That the budget deficit projections grew and the financial condition became increasingly dire is not a change in the *kind* of problem that VIESA sought to solve. It is a change in *degree*. Under *United States Trust*, this change in degree is not enough to render the impairment "reasonable in light of changed circumstances." 431 U.S. at 32.

We are also troubled by the assurances made to Union representatives during the negotiations. USW representatives, concerned that funding would not be available for the salary increases as a result of the financial crisis, asked the Government's chief negotiator if the Government would be able to fund the agreements. He responded yes. Rather than negotiating lower salaries with the Union employees, the Government promised the Union employees certain wages—even a pay increase for USW employees—in return for their making several concessions. Instead of honoring that promise or never making it in the first place, the Government chose the politically expedient route of reducing wages after it had received its benefit of the bargain. The Contract Clause is not a dead letter, and if it is to continue to have any force, it must

prohibit such self-serving, *post hoc* changes in contractual obligations.

We do not fault the Virgin Islands Government for its attempt to alleviate the severe budget crisis it was facing. The financial crisis required a solution. While we afford considerable deference to the Legislature's decision as to what the solution should be—even when the State (or, as in this case, the territorial government) is a party to an impaired contract—that deference is not absolute, nor can a Legislature's decision to impair a contract stand if it was unreasonable. Here, we are asked to decide whether the Virgin Islands' impairment of its contracts with Union employees was reasonable in light of the fact that it knew of the precarious financial condition when it agreed to the contracts. *United States Trust* requires that we hold that the impairment was unreasonable. Because any impairment must be both necessary *and* reasonable, the impairment here does not survive Contract Clause scrutiny.[6]

### IV.

Because VIESA substantially impaired the USW and AFT collective bargaining agreements, and such impairment was unreasonable, we hold that VIESA violates the Contract

---

[6] We note, however, that although VIESA substantially impaired the collective bargaining agreements, such impairment was not unreasonable on its face. Rather, VIESA's impairment of the agreements here was unreasonable in light of the timeline of events in this particular case. The agreements with AFT and USW were concluded *after* the justification for VIESA was known to the Government. Thus, VIESA violates the Contract Clause as applied only to the USW and AFT collective bargaining agreements.

Clause as applied to those collective bargaining agreements. Accordingly, we will reverse the District Court's order. We will also remand to the District Court so that it may reconsider its holding with respect to the Unions' territorial claims, specifically the Public Employee Relations Act claim, in light of this opinion.